**CENTURION AIR CARGO, INC., Plaintiff,**

v.

**UNITED PARCEL SERVICE CO., Defendant.**

**No. 02–22096–CV.**

United States District Court, S.D. Florida, Miami Division.

Jan. 16, 2004.

Joseph Z. Fleming, Esq., Greenberg Traurig, Andre Zamorano, Esw., Steel Hector & Davis, Miami, for Plaintiff.

Marilyn Joyce Holifield, Esq., Delia Mercedes Garcia, Esq., Holland & Knight, Miami, Philip A. Martin, Esq., Tony C.

Coleman, Esq., Frost Brown Todd, Louisville, KY, for Defendant.

## *ORDER*

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant United Parcel Service Co.'s Motion for Partial Summary Judgment (DE # 33) and Plaintiff Centurion Air Cargo, Inc.'s Motion for Summary Judgment (DE # 34).

This is a diversity action pursuant to 28 U.S.C. § 1332. Plaintiff Centurion Air Cargo, Inc. ("Centurion") moves for summary judgment on both counts of its complaint, while Defendant United Parcel Service Co. ("UPS") seeks summary judgment only on count II. In count I, Centurion alleges that UPS breached the parties' Post–Closing Transitional Services Agreement, dated August 24, 2000 (the "Post–Closing Agreement") by making a late payment to Centurion and taking a set-off from another obligated payment. The primary issue surrounding count II also revolves around UPS's set-off and whether it breached another contract between the parties, the Assets Purchase and Air Route Transfer Agreement, dated October 4, 1999 (the "Purchase Agreement").[1]

Because UPS acted within its contractual rights under section 11.04 of the Purchase Agreement in setting off $821,106.09 against its July 2002 installment to Centurion, it is entitled to judgment as a matter of law as to count II. In addition, construing the facts related to the Post–Closing Agreement in the light most favorable to UPS, Centurion is not entitled to summary judgment on count I.

---

1. The Purchase Agreement and Post–Closing Agreement, and amendments thereto, are attached to Centurion's complaint as exhibits 1 and 3, respectively. (DE # 1.)

Centurion also adds a claim for breach of the confidentiality provision contained in the Purchase Agreement, as well as generalized violations of the implied covenant of good faith and fair dealing under Florida law under both contracts between the parties.

## BACKGROUND

In entering into the Purchase Agreement, UPS, a Delaware corporation, purchased substantially all assets of Centurion, an air cargo and transportation service corporation based in Miami, Florida. The purchased assets included Centurion's cash and cash equivalents, prepaid expenses, accounts receivable, intellectual property, contractual rights, real property, transferable permits, route authority and goodwill. The Post–Closing Agreement, as detailed below, established a monthly payment schedule for the sale.

Included in the Purchase Agreement, Centurion also agreed to retain certain liabilities, including:

> Liabilities arising as a result of *Cargo Aerea B. Ch., S.A. v. Challenge Air Cargo, Inc. et al.* (claim by a former sales agent in Costa Rica), in excess of amounts accrued on the Current Balance Sheet . . . .

Purchase Agreement, Schedule 1.01(aaa).[2] The amount accrued on the "Current Balance Sheet" as a result of *Cargo Aerea B. Ch., S.A. v. Challenge Air Cargo, Inc. et al.* (the "Cargo Aerea litigation" or "Costa Rican litigation"), a lawsuit filed approximately fifteen years ago by a former Costa Rican agent of Centurion for nonpayment of monies owed, was $200,000. Thus, Centurion would remain liable for damages in excess of $200,000 resulting from the Cargo Aerea litigation.

At the time of consummation of the Purchase Agreement, the Costa Rican court had issued a final judgment of liability and damages against Centurion.[3] Several months after UPS's purchase of Centurion's assets, Cargo Aerea, the plaintiff in the Costa Rican litigation, attached UPS's Costa Rican assets and was awarded an order of garnishment against UPS's Costa Rican revenues in anticipation of satisfaction of a final judgment against Centurion. At that point, UPS, pursuant to a separate settlement agreement with Centurion, filed an emergency motion in a pending arbitration with the American Arbitration Association ("AAA") to force Centurion to post a bond or other acceptable surety in Costa Rica to dissolve Cargo Aerea's attachment and garnishment of UPS assets and revenues. On May 30, 2002, the arbitrator ordered Centurion to post a bond or other surety with the Costa Rican court for $821,106.09, or any lesser amount that would dissolve Cargo Aerea's attachment and garnishment (the "arbitration order").

While the parties' respective petitions to vacate and confirm the arbitration order were pending in this District before the Honorable James Lawrence King, United States District Judge, in case no. 02–21656–CIV–KING, UPS informed Centurion that it was exercising a set-off of $821,106.09 from its July 2002 monthly payment (the "set-off" or "July 2002 set-off"). The set-off figure represented the amount needed to post the bond in the Costa Rican court as directed by the arbitration order. UPS argues that it appropriately effected the set-off pursuant to both of the contracts at issue in this action. The Post–Closing Agreement, which fixed UPS's payment schedule to Centurion, provided, in relevant part:

> *Additional Transitional Services.* In consideration of [Centurion's]: (i) providing transitional services under

---

**2.** The schedule to the Purchase Agreement is not part of the record, but the parties' filings stipulate to the content of the sections discussed here.

**3.** Centurion appealed the award, resulting in a remand to the Costa Rican trial court on the issue of damages. Subsequent to the remand, that court entered a judgment of damages and legal fees against Centurion in an amount equivalent to approximately $800,000.

this Agreement to obtain the full benefit of the Route Authority and the Assets being transferred to UPS under the Purchase Agreement, and (ii) providing assistance in obtaining the relevant Foreign Licenses authorizing UPS to conduct the Route Authority, and (iii) waiving the right to require the Purchaser to "dry lease" from the Seller three DC–10–40 aircraft used in the Business as contemplated by Section 1.01(ddd) of the Purchase Agreement and that certain letter agreement between UPS and CAC dated October 5, 1999, UPS shall pay [Centurion] $31,374,648 in 36 equal consecutive monthly installments of $871,518 each, due and payable on the 1st day of each month beginning with the month of September 2000. **The amounts due and payable pursuant to this clause (g) shall not be subject to set-off, reduction or claim of any kind, including without limitation pursuant to Section 11 of the Purchase Agreement, except as set forth in Section 11.04 of the Purchase Agreement.**

Post–Closing Agreement, § 3(g) (emphasis added). Section 11.04 of the Purchase Agreement, referenced above, states:

> *Right of Offset.* . . . Should the Seller [Centurion] or Ullrich fail or refuse to pay any such amounts promptly after the request of the Purchaser [UPS], then the Purchaser, at its election and without limiting the Purchaser's other rights and remedies, may recover amounts due and owing to the Purchaser in accordance with Sections 4(b), (c) and (d) of the Escrow Agreement; or, with respect to the amounts in excess of the funds held in escrow pursuant to the Escrow Agreement, **if the Purchaser obtains a final, nonappealable judicial order or binding arbitral decision in the Purchaser's favor that the Seller is obligated to indemnify the Purchaser under this Section 11, the Purchaser may offset the amount so ordered or decided against amounts otherwise due by Purchaser to the Seller under the Post–Closing Transitional Services Agreement.**

Second Amendment to Purchase Agreement, § 11.04 (emphasis added).

The Court first addresses count II, as the set-off and alleged ensuant breach is the impetus for the instant litigation. As to that count, the question is whether the arbitration order directing Centurion to post a bond or other surety (1) established an obligation of Centurion to indemnify UPS for damages in the Costa Rican lawsuit, and (2) constituted a "binding arbitral decision" on July 1, 2002, the date on which UPS offset the $821,106.09 from its monthly installment. Centurion also attempts to add a claim for breach of the confidentiality clause in the Purchase Agreement.

In count I, which is only at issue as to Centurion's motion for summary judgment, Centurion alleges that it incurred damages as a result of UPS's (1) delay in making its June 2002 installment and (2) violation of the implied covenant of good faith and fair dealing.

## DISCUSSION

### 1. Summary Judgment Standard

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. *Twiss v. Kury*, 25 F.3d 1551, 1554 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* However, the nonmoving party:

> may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In determining whether this evidentiary threshold has been met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505. Summary judgment may be granted if the nonmovant fails to adduce evidence which, when viewed in a light most favorable to it, would support a jury finding in its favor. *Id.* at 254–55, 106 S.Ct. 2505.

Additionally, the nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *Id.*

**2. The July 2002 Set-off and Alleged Breach of the Purchase Agreement**

**a. Did the arbitration order determine that Centurion is obligated to indemnify UPS for the Costa Rican lawsuit?**

█ Section 11.04 of the Purchase Agreement authorized UPS's set-off only if it stemmed from Centurion's duty to indemnify. A review of the record and the arbitration order illustrates that the arbitrator issued his decision based on Centurion's duty to indemnify UPS for damages "resulting to [UPS] either directly or indirectly, from or out of ... (d) any and all Retained Liabilities." Purchase Agreement, § 11.02. It is undisputed that these "Retained Liabilities" included damages stemming from the Cargo Aerea litigation. Purchase Agreement, Schedule 1.01(aaa). The arbitration order was therefore rooted in Centurion's duty to indemnify. Indeed, the issue was arbitrable only because it involved indemnity claims. *See* Jan. 30, 2002 Settlement Agreement, § 5 (found at 02–21656–CIV–KING (DE

# 10)) ("The parties hereby agree to submit to arbitration ... the Indemnity Claims."); *Id.*, Ex. C (including the Costa Rican lawsuit as an "Indemnity Claim"); Judge King's Aug. 22, 2002 Judgment Confirming Arbitration Order (found at 02–21656–CIV–KING (DE # 19)) (holding that arbitrator had jurisdiction because the parties agreed to arbitrate indemnity claims flowing from the Costa Rican litigation, pursuant to Settlement Agreement). Accordingly, UPS offset its monthly installment due to Centurion's failure to comply with the arbitration order's mandate that Centurion indemnify it from damages resulting from the Cargo Aerea litigation.

### b. Did the arbitration order constitute a "binding arbitral decision"?

■ The arbitration order satisfied the Purchase Agreement's "binding" requirement. Although Judge King confirmed the arbitration order in case no. 02–21656–CIV–KING on August 22, 2002, after UPS effected the set-off, the arbitration order was a binding decision before then and clears UPS of breaching the Purchase Agreement. The parties, by way of a separate settlement agreement, consented to arbitrate the issue of indemnity involving damages from the Cargo Aerea litigation. Settlement Agreement, § 5 (found at 02–21656–CIV–KING (DE # 10)). While the Settlement Agreement did not contain the terms "binding arbitral decision," implicit in the agreement to arbitrate are the parties' expectations to receive a binding directive. Generally, absent an indication of the parties that they seek other utilization of an arbitration, an arbitral decision lacking the teeth of a conclusive judgment renders the arbitration process moot and goes against the virtues of, and the strong policy favoring, arbitration. *See, e.g., Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Cassedy v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 751 So.2d 143, 150 (Fla. 1st DCA 2000).

■ Moreover, contrary to Centurion's arguments, the fact that UPS did not initially move to confirm the arbitration order does not affect the finality or binding power of the order. The parties agreed to arbitrate according to the Commercial Arbitration Rules of the AAA. Rule 48(c) provides that "[p]arties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof." Rule 48(c), AAA Commercial Rules of Arbitration. A district court analyzing the same rule and an argument similar to Centurion's concluded:

> The binding effect of the arbitration clause does not turn on whether Defendants have enforced the award; rather, **the arbitration award becomes final once the arbitrator releases his findings.** This reasoning is proper given the parties' reliance on AAA procedural rules and the absence of language in the policy indicating that the arbitration clause was nonbinding.

*Duke v. Crop Growers Ins., Inc.,* 70 F.Supp.2d 711, 716 n. 3 (S.D.Tex.1999) (emphasis added); *see also McKee v. Home Buyers Warranty Corp. II,* 45 F.3d 981, 983 (5th Cir.1995) ("Numerous courts have held that arbitration is binding where the rules under which the arbitration is conducted call for binding arbitration.... [A]ll parties are on notice that resort to AAA arbitration will be deemed both binding end subject to entry of judgment unless the parties expressly agree otherwise."); *Rainwater v. Nat'l Home Ins. Co.,* 944 F.2d 190 (4th Cir.1991) (holding that an arbitration in accordance with AAA rules is a binding arbitration).

For the aforementioned reasons, the arbitration order was a "binding arbitral decision" on May 30, 2002 and, consequently, UPS did not breach the Purchase Agreement by taking the July 2002 set-off. When construing the facts in the light most favorable to Centurion, it is clear that UPS acted pursuant to the Purchase Agreement and simply protected its rights in setting off the amount of the bond it posted with the Costa Rican court.

### 3. UPS's Untimely June 2002 Monthly Installment

█ Centurion also alleges a breach of the Post–Closing Agreement when UPS delinquently paid its June 2002 monthly installment, a claim that garners scant attention in the pleadings and record. Centurion claims that UPS's untimeliness "negatively impacted its business operations and otherwise caused damage to Plaintiff" and caused it to fail regarding certain lease obligations. Compl., ¶ 19; Pl.'s Statement of Material Facts, ¶ 19; Pl.'s Mot. for Summ. J. at 2. However, the record is devoid of evidence of specific damages. The exhibits and affidavits cited in purported support of these damages refer to losses suffered as a result of the July set-off, a separate alleged breach which the Court disposed of above via summary judgment.

### 4. Breach of Confidentiality and Violation of Implied Covenant of Good Faith and Fair Dealing

Finally, Centurion, for the first time, alleges breaches of the confidentiality provision at section 14 of the Purchase Agreement and a violation of the implied covenant of good faith and fair dealing under Florida law. These claims were not asserted in Centurion's complaint, nor is there an amended complaint. Centurion audaciously accuses *UPS* of seeking to introduce new issues in its reply to Centurion's opposition to partial summary judgment. Pl.'s Mot. to Strike (DE # 70). However, UPS's reply simply responded to fresh issues raised in the fourth quarter of litigation by Centurion's motion papers.

██ Although Fed.R.Civ.P. 8 requires a short and plain statement of the claim and serves only to put the defendant on notice, the rule nonetheless mandates the actual averment of a claim. "[P]leadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon ...." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1202 (2d ed.2003)

UPS can hardly be considered to have been put on notice of the breach of confidentiality claim. The complaint raised allegations solely concerning breaches caused by the late June 2002 payment and July 2002 set-off. There was no hint that alleged conduct relatively unrelated to these breaches would be at issue in this action. As to the fair dealing claim, though it is difficult to discern due to the generality with which it is alleged in Centurion's opposition, it appears that the claim arises primarily out of the same facts as the alleged breach of confidentiality. At the same time, however, the generality of the claim, when viewed in the light most favorable to Centurion, arguably put UPS on notice. *See* Pl.'s Opp'n to D.'s Mot. for Partial Summ. J. at 18.

█ Even considered on the merits, however, these claims fail. Centurion has alleged no concrete damages as a result of the alleged breaches of confidentiality or the implied covenant of good faith and fair dealing. Exactly how UPS's alleged breach of confidentiality affected the judgment against Centurion in Costa Rican court or otherwise damaged Centurion is only speculatively asserted and would not allow a jury to reasonably find in its favor.

The affidavits of Marvin Cespedes and Peter Ullrich simply repeat the conjectural allegations contained in Centurion's complaint and motion papers and provide no basis for a finding of damages caused by UPS's alleged disclosure of confidential information. Therefore, these claims do not prevent summary judgment for UPS on count II, *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548, *Anderson,* 477 U.S. at 254–55, 106 S.Ct. 2505, nor does the fair dealing claim support summary judgment for Centurion as to count I.

### 5. Remaining Claims

Aside from what appear to be minor and, as of now, unsupported claims of damages resulting from UPS's (1) tardy June 2002 monthly installment and (2) alleged violation of the implied covenant of good faith and fair dealing, both involving only the Post–Closing Agreement, the only other remaining issue in this case is (3) whether UPS breached the Post–Closing Agreement in taking the July 2002 set-off. That claim, however, appears to be all but resolved, as this alleged breach of the Post–Closing Agreement is intertwined with a breach of the Purchase Agreement; that is, the reduced July 2002 monthly installment breached the Post–Closing Agreement only if UPS took the set-off in noncompliance with the Purchase Agreement, which the Court today determines did not occur.[4] The issues in controversy for trial are to be narrowed accordingly.

### CONCLUSION

Based on the foregoing,

UPON CONSIDERATION of the motions, the pertinent portions of the record, and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that UPS's Motion for Partial Summary Judgment (DE # 33) is GRANTED. Count II of Centurion's complaint is DISMISSED WITH PREJUDICE. It is further

ORDERED AND ADJUDGED that Centurion's Motion for Summary Judgment (DE # 34) is DENIED. It is further

ORDERED AND ADJUDGED that Centurion's Motion to Strike Reply of UPS in Support of Motion for Summary Judgment, or, in the alternative, to Allow Appropriate Briefing is DENIED (DE # 70).

---

4. Because UPS moves for summary judgment only as to count II (breach of Purchase Agreement), the Court declines to *sua sponte* consider summary judgment for UPS as to count I (breach of Post–Closing Agreement).